# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SCOTT A. PRIDEMORE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:11cv00010 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Scott A. Pridemore, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Pridemore protectively filed his applications for DIB and SSI on May 24, 2006, alleging disability as of May 12, 2006, due to back pain, his legs giving way, arthritis, COPD, nerve loss in the legs and arms, carpal tunnel syndrome, slight hearing loss and depression and anxiety. (Record, ("R."), at 118-20, 123-26, 141, 146, 181.) The claims were denied initially and on reconsideration. (R. at 71-73, 78-80, 84, 85-87, 89-90, 92-93, 95-96.) Pridemore then requested a hearing before an administrative law judge, ("ALJ"). (R. at 97-98.) The hearing was held on February 2, 2009, at which Pridemore was represented by counsel. (R. at 24-64.)

By decision dated April 23, 2009, the ALJ denied Pridemore's claims. (R. at 15-23.) The ALJ found that Pridemore met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2007. (R. at 17.) The ALJ also found that Pridemore had not engaged in substantial gainful activity since May 12, 2006, the alleged onset date. (R. at 17.) The ALJ determined that the medical evidence established that Pridemore had a severe impairment, namely a back disorder, but he found that Pridemore's impairment did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.) The ALJ also found that Pridemore had the residual

-2-

functional capacity to perform light[1] work. (R. at 19-22.) Therefore, the ALJ found that Pridemore was unable to perform his past relevant work as an electrician helper and a mobile home set-up man, both at the medium[2] level of exertion. (R. at 22.) Given Pridemore's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that he could perform, including a job as an electrician helper at the light level of exertion. (R. at 22-23.) Thus, the ALJ found that Pridemore was not under a disability as defined under the Act and was not eligible for benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2011).

After the ALJ issued his decision, Pridemore pursued his administrative appeals, (R. at 8-11), but the Appeals Council denied his request for review. (R. at 1-4.) Pridemore then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Pridemore's motion for summary judgment filed September 15, 2011, and the Commissioner's motion for summary judgment filed October 17, 2011.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2011).

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2011).

-3-

## II. Facts[3]

Pridemore was born in 1976, (R. at 118, 123), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He received his General Equivalency Development, ("GED"), diploma and has special training in diesel mechanics. (R. at 151.) Pridemore testified that he last worked as an electrician helper, but had to quit due to an injured lower back, which caused pain radiating into his legs. (R. at 31-32, 34-35.) He stated that he had been receiving treatment from Dr. Ehtesham, a psychiatrist, for approximately a year and a half on a monthly basis for depression. (R. at 38-39.) Pridemore stated that Dr. Ehtesham had prescribed medication, but that his condition had remained "about the same." (R. at 38-39.) Pridemore further testified that he had difficulty completing tasks, focusing, remembering things and sitting still and that he got "very irritated real easy." (R. at 39, 43.) He stated that he had difficulty sleeping at night, averaging only two or three hours nightly. (R. at 39.) Pridemore stated that he had no energy during the day. (R. at 39.) He stated that he had to lie down approximately 90 percent of the time on a bad day, partly due to depression. (R. at 41.) Pridemore testified that he had lost interest in things that he used to enjoy, including hunting, fishing, building model cars and playing with his children. (R. at 41.) He stated that he had one or two crying spells weekly and that he did not visit with friends like he used to, noting that he did not like to be around a lot of people. (R. at 41-42.) Pridemore testified that he might attend two or three of his daughter's softball games during a season. (R. at 43.)

---

[3] Because Pridemore appeals only the ALJ's findings regarding his alleged mental impairments, the facts will be limited to the evidence relevant thereto.

Case 2:11-cv-00010-JPJ-PMS   Document 18   Filed 04/09/12   Page 4 of 21   Pageid#: 563

Dobbs, a vocational expert also was present and testified at Pridemore's hearing.[4]  (R. at 63-64.)  Dobbs classified Pridemore's past work as an electrician helper as medium and skilled, as a mobile home setter as heavy[5] and unskilled and as a factory worker as at least medium and unskilled.  (R. at 63.)  Dobbs testified that there were some transferable skills to light jobs, including an electrician helper for manufactured buildings, a troubleshooter line attendant and an electric meter fixer.[6]  (R. at 64.)

In rendering his decision, the ALJ reviewed records from Norton Community Hospital; Dr. Gurcharan Kanwal, M.D.; Dr. Mohammed A. Bhatti, M.D.; Dr. Kevin Blackwell, D.O.; Dr. Uzma Ehtesham, M.D.; Community Orthopedics; Lonesome Pine Hospital; Dr. Shirish Shahane, M.D., a state agency physician; B. Wayne Lanthorn, Ph.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Mountain View Regional Medical Center; Howard S. Leizer, Ph.D., a state agency psychologist; Coeburn Hospital Clinic; Abingdon Orthopedic Associates, P.C.; and Dr. Esther Adade, M.D.

Pridemore saw Dr. Uzma Ehtesham, M.D., on June 28, 2006, upon Dr. Mohammed A. Bhatti's referral.  (R. at 305-06.)  He reported paranoia, anger,

---

[4] The transcript of the hearing references only "Mr. Dobbs."  (R. at 24-25.)

[5] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds.  If someone can perform heavy work, he also can perform medium, light and sedentary work.  *See* 20 C.F.R. § 404.1567(d), 416.967(d) (2011).

[6] The vocational expert listed another job, but it was largely inaudible.  (R. at 64.)

irritability, panic attacks and becoming violent at times. (R. at 305.) He stated that his mind raced a lot and he got hyper. (R. at 305.) He was alert and oriented, and Dr. Ehtesham found his mood to be sad with a restricted affect. (R. at 305.) Dr. Ehtesham further found that Pridemore had paranoid ideations and decreased memory and concentration. (R. at 306.) She diagnosed major depressive disorder with the need to rule out bipolar disorder. (R. at 306.) She placed Pridemore's then-current Global Assessment of Functioning, ("GAF"), score at 60,[7] prescribed Seroquel and continued him on Valium. (R. at 306.) Pridemore returned to Dr. Ehtesham on July 13, 2006, reporting increased grouchiness and depression, as well as worsened mood swings and anxiety. (R. at 304.) Mental status examination was unremarkable, and Dr. Ehtesham discontinued Seroquel and prescribed Zyprexa. (R. at 304.) On August 7, 2006, Pridemore again reported that his depression and anger were worse, and he was having a lot of problems with panic. (R. at 303.) His mood was fair with a congruent affect. (R. at 303.) Dr. Ehtesham increased the dosage of Zyprexa and prescribed Lexapro. (R. at 303.) On September 6, 2006, Pridemore continued to report racing thoughts at times, more frequent panic attacks and difficulty with memory and concentration. (R. at 302.) Dr. Ehtesham increased Pridemore's medication dosages. (R. at 302.) On October 3, 2006, Pridemore stated that his depression was improving, but his sleep remained decreased due to multiple stressors. (R. at 473.) He stated that his anger was not improving, and his mind continued to race. (R. at 473.) However, Pridemore reported that he was not taking his medications. (R. at 473.) His mood

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

-6-

was fair with a congruent affect. (R. at 473.) Dr. Ehtesham diagnosed bipolar disorder and increased Pridemore's dosage of Zyprexa. (R. at 473.) On November 8, 2006, Pridemore stated that his anger was less of a problem, and his depression was worse. (R. at 472.) He had continued racing thoughts and felt hyper at times. (R. at 472.) His mood was fair with a congruent affect. (R. at 472.) Dr. Ehtesham again increased Pridemore's dosage of Zyprexa and prescribed Cymbalta. (R. at 472.)

Pridemore saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on December 5, 2006, for a consultative psychological examination. (R. at 333-38.) He reported battling depression for some time, noting that he had seen Dr. Ehtesham for several sessions and had been diagnosed with major depressive disorder. (R. at 336.) Pridemore also reported generalized anxiety and "nervousness," and he stated that over the previous year, he had developed panic attacks which occurred six to eight times weekly, sometimes as many as three per day. (R. at 336.) He stated that these panic attacks lasted approximately five minutes. (R. at 336.) He was fully oriented with a decidedly blunt affect and overall depressed mood. (R. at 333, 335.) He exhibited no signs of delusional thinking or any frank symptoms of ongoing psychotic processes. (R. at 335.) In addition to the other symptoms that Pridemore had reported to Dr. Ehtesham, Lanthorn noted that Pridemore struggled with transient suicidal ideation with no firm plan or intent. (R. at 336.) Lanthorn diagnosed Pridemore with major depressive disorder, recurrent, severe; pain disorder, associated with both psychological factors and general medical conditions, chronic; anxiety disorder with both generalized anxiety and panic attacks likely due to chronic physical

-7-

problems, pain; and he placed his then-current GAF score at 50.[8]  (R. at 337.)  He considered Pridemore's prognosis guarded.  (R. at 337.)

Lanthorn opined that Pridemore was functioning in the low average range of intelligence with some significant short-term memory loss.  (R. at 337.)  He found that Pridemore manifested many of the signs of clinical depression, including anhedonia, some social withdrawal, dysphoria, a low degree of energy, an absent sex drive and some difficulties with concentration at times.  (R. at 337.)  Lanthorn concluded that it was "difficult to imagine … Pridemore functioning in any job requiring a 40-hour workweek, even with simple and repetitive tasks."  (R. at 337.)  He strongly encouraged Pridemore to continue receiving psychiatric care and, ideally, see a psychotherapist to assist him in making the many adjustments with which he was faced at that time.  (R. at 337-38.)

When Pridemore returned to Dr. Ehtesham on December 6, 2006, he reported continued decreased sleep.  (R. at 471.)  His depression was stable and anxiety was fair, but his anger was worsened.  (R. at 471.)  Dr. Ehtesham deemed Pridemore's mood fair, she discontinued Cymbalta, and she increased the dosage of Lexapro.  (R. at 471.)  Dr. Ehtesham continued to diagnose bipolar disorder.  (R. at 471.)  On January 4, 2007, Pridemore reported anxiety attacks, anger, irritability, racing thoughts, paranoia and audiovisual hallucinations.  (R. at 470.)  He also reported feeling sad with continued crying spells.  (R. at 470.)  Dr. Ehtesham found Pridemore hyper with a fair mood and irritable affect.  (R. at 470.)  She diagnosed bipolar disorder and generalized anxiety disorder.  (R. at 470.)  She prescribed

---

[8] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …"  DSM-IV at 32.

-8-

Abilify and Trazadone, and she continued Lexapro, but decreased the dosage of Zyprexa. (R. at 470.)

On January 11, 2007, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Pridemore suffered from an affective disorder and an anxiety-related disorder and that a residual functional capacity assessment was necessary. (R. at 363-79.) Jennings found that Pridemore was moderately restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 374.) Jennings deemed Pridemore's allegations partially credible. (R. at 378.)

Jennings also completed a Mental Residual Functional Capacity Assessment the same day. (R. at 380-82.) She opined that Pridemore was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to travel in unfamiliar places or use public transportation and to set goals or make plans independently of others. (R. at 380-81.) In all other areas, Pridemore was found to be not significantly limited. (R. at 380-81.) Jennings opined that the limitations resulting from Pridemore's impairments did not preclude him from meeting the basic mental demands of competitive work on a

sustained basis. (R. at 382.) She noted that Pridemore's pain appeared to be contributing to his mental condition, but his psychological symptoms alone would restrict him to simple, unskilled work. (R. at 383.)

Pridemore returned to Dr. Ehtesham on March 14, 2007, stating that he was out of medications and that his depression and irritability were worse. (R. at 469.) He reported continued audiovisual hallucinations. (R. at 469.) Pridemore's appearance was labile, his mood was anxious, his affect was depressed, sensorium and memory were intact, thought content was unremarkable, thought process was linear, and judgment was normal. (R. at 469.) Dr. Ehtesham continued to diagnose bipolar disorder. (R. at 469.) She reinitiated Lexapro and Trazadone and prescribed Risperdal. (R. at 469.) On April 2, 2007, Pridemore reported less intense anger and fewer hallucinations, but continued racing thoughts and decreased sleep. (R. at 468.) Dr. Ehtesham diagnosed bipolar disorder, and she increased Pridemore's medication dosages. (R. at 468.)

On August 1, 2007, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF, finding that Pridemore suffered from an affective disorder and an anxiety-related disorder and that a residual functional capacity assessment was necessary. (R. at 445-61.) Leizer opined that Pridemore was moderately restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning and experienced marked difficulties in maintaining concentration, persistence or pace, but had experienced no episodes of decompensation of extended duration. (R. at 456.) Leizer deemed Pridemore's allegations partially credible. (R. at 460.)

The same day, Leizer also completed a Mental Residual Functional Capacity Assessment, finding that Pridemore was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. at 462-64.) Leizer concluded that Pridemore's pain was contributing to his mental condition, but that his psychological symptoms alone would restrict him to simple, unskilled work. (R. at 464.) He opined that the limitations resulting from Pridemore's impairments did not preclude him from meeting the basic mental demands of competitive work on a sustained basis. (R. at 464.)

On October 26, 2007, Dr. Ehtesham completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental). (R. at 465-67.) She opined that Pridemore was markedly[9] limited in his abilities to understand and remember simple instructions and to interact appropriately with the public. (R. at 465-66.) Dr. Ehtesham further opined that Pridemore was extremely[10] limited in his abilities to carry out simple instructions, to make judgments on simple work-related

_____

[9] A marked limitation is defined on this mental assessment as one indicating serious limitation and a substantial loss in the ability to effectively function, resulting in unsatisfactory work performance. (R. at 465.)

[10] An extreme limitation is defined on this mental assessment as a major limitation with no useful ability to function in the given area. (R. at 465.)

decisions, to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with supervisors, to interact appropriately with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 465-66.) Dr. Ehtesham stated that Pridemore had depression and anxiety, but that her information was not up to date because she had not seen Pridemore for several months. (R. at 465-66.)

When Pridemore saw Dr. Ehtesham on January 26, 2009, he complained of agitation, excessive worry, fatigue, irritability, sadness, excessive guilt low self-esteem, hypersomnia, racing thoughts, paranoia and audio and visual hallucinations. (R. at 497-502.) Pridemore's affect was anxious with a congruent mood. (R. at 500.) He denied then-current homicidal or suicidal ideations. (R. at 500.) His judgment was intact, but poor, and reality testing was intact, but partial. (R. at 500.) Dr. Ehtesham diagnosed major depressive disorder and general anxiety disorder, and she assessed Pridemore's then-current GAF score at 60. (R. at 502.) Dr. Ehtesham prescribed Lexapro and Risperdal. (R. at 502.)

On February 6, 2009, Dr. Ehtesham completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), finding that Pridemore was markedly limited in his abilities to understand and remember simple instructions, to understand and remember complex instructions and to interact appropriately with the public. (R. at 503-05.) Dr. Ehtesham further found that Pridemore was extremely limited in his abilities to carry out simple instructions, to make judgments on simple work-related decisions, to carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with

-12-

supervisors, to interact appropriately with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 503-04.) In support of these findings, Dr. Ehtesham stated that Pridemore had extreme anger and mood swings, as well as severe panic attacks. (R. at 503-04.) She opined that Pridemore was permanently disabled. (R. at 505.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1250(a), 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B)

-13-

(West 2003, West 2011 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Pridemore argues that the ALJ erred by failing to address all of the evidence in the record and indicate the weight given to such evidence. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5.) Pridemore also argues that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Plaintiff's Brief at 5-7.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion,

-14-

even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Pridemore first argues that the ALJ erred by failing to address all the evidence in the record and indicate the weight given to such evidence. (Plaintiff's Brief at 5.) Specifically, Pridemore argues that the ALJ failed to evaluate the GAF score assessed by Lanthorn in December 2006 or to indicate the weight given to such opinion evidence. (Plaintiff's Brief at 5.) For all of the following reasons, I agree. It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Here, in his opinion, the ALJ gave a brief summary of Pridemore's consultative examination with Lanthorn. (R. at 20.) However, he did not include

-15-

Lanthorn's finding that Pridemore's GAF score in December 2006 was 50, indicating serious symptoms, nor did he state what, if any, weight he was giving to Lanthorn's findings. Additionally, although two state agency psychologists completed PRTFs and Mental Residual Functional Capacity Assessments of Pridemore, the ALJ did not even mention these in his decision. The only mental source for which the ALJ specified the weight given was Dr. Ehtesham. The ALJ stated that he accorded little weight to Dr. Ehtesham's opinions concerning Pridemore's mental limitations because Dr. Ehtesham recorded few objective clinical findings to document Pridemore's mental status and had seen Pridemore on only one occasion since April 2, 2007. (R. at 21-22.)

It is for all of these reasons that I find that the ALJ erred by failing to analyze all of the relevant evidence and state the weight given to it, thereby precluding the court's ability to determine whether the ALJ's decision is supported by substantial evidence.

Next, Pridemore argues that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Plaintiff's Brief at 5-7.) In particular, Pridemore argues that the ALJ substituted his opinions for those of Lanthorn and Dr. Ehtesham. For the following reasons, I agree.

The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2011). Basic work-related mental activities include understanding, remembering and carrying out job instructions, use of judgment, responding

-16-

appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(a), 416.921(a). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (citations omitted). Although the Social Security regulations do not define the term "significant," this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." *See* 581 F. Supp. at 159.

Here, the record is replete with evidence that Pridemore's mental impairments are not "meaningless" as they relate to his performance of basic work-related mental functions. For instance, his treating psychiatrist, Dr. Ehtesham, treated Pridemore for major depressive disorder, bipolar disorder and generalized anxiety disorder from June 2006 through January 2009. Pridemore's symptoms rather consistently included paranoia, anger, irritability, decreased sleep, racing thoughts, hyperactivity, panic attacks, crying spells, mood swings, decreased memory and concentration and audiovisual hallucinations. Dr. Ehtesham treated Pridemore with various medications and dosages.

On October 26, 2007, Dr. Ehtesham opined that Pridemore was either markedly limited or extremely limited in all areas of understanding, remembering

-17-

and carrying out instructions, interacting appropriately with supervisors, co-workers and the public, as well as responding to changes in the routine work setting. (R. at 465-66.) While it is true that Dr. Ehtesham had not treated Pridemore since April 2007, state agency psychologist Leizer did complete a PRTF during this time period, on August 1, 2007, finding that Pridemore was moderately restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning and experienced marked difficulties in maintaining concentration, persistence or pace. (R. at 456.) Additionally, in a Mental Residual Functional Capacity Assessment completed the same day, Leizer opined that Pridemore was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. at 462-64.) Thus, within this gap of treatment by Dr. Ehtesham, state agency psychologist Leizer completed mental assessments supporting a finding that Pridemore suffered from a severe mental impairment.

Thereafter, when Dr. Ehtesham treated Pridemore in January 2009, she found that Pridemore had an anxious affect with congruent mood, and she continued to diagnose major depressive disorder and generalized anxiety disorder. (R. at 502.) Shortly thereafter, on February 6, 2009, Dr. Ehtesham again opined that Pridemore was either markedly limited or extremely limited in all categories

-18-

of work-related mental activities. (R. at 503-05.)

Aside from Dr. Ehtesham's opinions, and the opinion of Leizer during Dr. Ehtesham's gap in treatment of Pridemore, the other evidence of record does not support a finding that Pridemore does not suffer from a severe mental impairment. For instance, on December 5, 2006, Pridemore saw consultative psychological examiner Lanthorn, who diagnosed major depressive disorder, recurrent, severe; pain disorder, associated with both psychological factors and general medical conditions, chronic; anxiety disorder with both generalized anxiety and panic attacks likely due to chronic physical problems, pain; and he placed Pridemore's then-current GAF score at 50, indicating serious impairment. (R. at 337.) Lanthorn opined that Pridemore had some significant short-term memory loss and that he had difficulty concentrating at times. (R. at 337.) Lanthorn deemed Pridemore's prognosis guarded. (R. at 337.) The following month, in January 2007, state agency psychologist Jennings completed a PRTF finding that Pridemore was moderately restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace. (R. at 374.)

All of this being said, I find that every psychological source contained in the record, whether treating, consultative or reviewing, imposed limitations on Pridemore's basic work-related mental abilities that cannot be viewed as meaningless, and in some instances, are quite significant. Despite some variance in the degree of limitation imposed by these psychological sources, the fact remains that they all imposed limitations that cannot be considered meaningless and would have more than a minimal effect on his ability to work. To find

-19-

otherwise, the ALJ would have to discount all of the opinion evidence regarding Pridemore's work-related mental limitations and substitute his opinion therefore. It is for all of these reasons that I find that substantial evidence does not support the ALJ's finding that Pridemore did not suffer from a severe mental impairment.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  The ALJ erred by failing to analyze all the relevant psychological evidence and state the weight given thereto;

2.  Substantial evidence does not exist to support the Commissioner's finding that Pridemore does not suffer from a severe mental impairment; and

3.  Substantial evidence does not exist to support the Commissioner's finding that Pridemore was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Pridemore's and the Commissioner's motions for summary judgment, vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further development in accordance with this Report and Recommendation.

-20-

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     April 9, 2012.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-21-